Julian Well No. 1 Syndicate, F. E. Foster, H. A. Penn and R. S. Brenneman, Trustees for Unit Owners v. Commissioner. Julian Well No. 2 Syndicate, F. E. Foster, H. A. Penn and R. S. Brenneman, Trustees for Unit Owners v. Commissioner. Julian Well No. 3 Syndicate, F. E. Foster, H. A. Penn and R. S. Brenneman, Trustees for Unit Owners v. Commissioner. Julian Wells No. 11, 12 and Pico Syndicate, F. E. Foster, H. A. Penn and R. S. Brenneman, Trustees v. Commissioner. Julian Wells No. 11, 12 and Pico Syndicate, F. E. Foster, H. A. Penn and R. S. Brenneman, Trustees v. Commissioner.
Julian Well No. 1 Syndicate v. Commissioner
Docket Nos. 512, 513, 514, 515, 1696.
United States Tax Court
1944 Tax Ct. Memo LEXIS 30; 3 T.C.M. (CCH) 1281; T.C.M. (RIA) 44388; November 29, 1944
*30 Harold C. Morton, Esq., 1126 Pacific Mutual Bldg., Los Angeles, Calif., for the petitioners. E. A. Tonjes, Esq., for the respondent. HILL Memorandum Findings of Fact and Opinion HILL, Judge: The Commissioner determined deficiencies as follows: Docket No.
Year
Kind of Tax
Deficiency
512
1938
Income
$ 780.62
1939
Income
1,499.11
1940
Income
841.86
513
1938
Income
228.47
1939
Income
835.81
1940
Income
308.74
514
1938
Income
170.72
1939
Income
1,097.35
1940
Income
279.03
515
1940
Income
124.04
1696
1939
Income
138.04
Declared Value Excess-Profits
132.52
The question is whether, during the years 1938, 1939 and 1940, petitioners were associations and therefore subject to taxes as corporations. Fiduciary returns for the years in question were filed with the collector of internal revenue for the sixth collection district in California. Findings of Fact In 1922 C. C. Julian and his wife became sublessees of oil land in Los Angeles County, California. They assigned their interest in a portion of the lease to the Citizens Trust and Savings Bank with a provision that all covenants of the underlying lease were to be performed entirely *31 by the assignors. The bank and Julian thereupon executed a declaration of trust which recited the above assignment, the bank to hold the lease in trust for 25 years for the benefit of Julian and his assigns but without power other than to reconvey at the end of the term, subject to any assignment meanwhile made by Julian of the proceeds of petroleum produced from any well on the premises. The trustee accepted no liability for payment of rent or preservation of the integrity of the lease. Upon assignment by Julian of any proceeds of petroleum produced the trustee was to be furnished with a copy and the assignee should not be entitled to any interest in the trust or the lease until he should have assented to the declaration of trust in writing. (This provision was never enforced). The instrument further provided that when Julian assigned any interest in the proceeds and when he had the proceeds paid to the trustee, the latter was to hold and disburse such funds to pay the expenses of the trust and "To pay any balance it may have on hand upon the sale and exclusive order of said C. C. Julian and to the person, persons, firm, firms, corporation or corporations designated by him, he being *32 hereby given exclusive control of the lease and all matters connected therewith or appurtenant thereto as agent for any and all assignees of the aforementioned production of oil and he shall be so recognized by the Trustee, and the said Trustee shall in no event be answerable nor chargeable with the application of the funds so disbursed by it under the orders of said C. C. Julian." Should the trustee exercise its right to relinquish the trust on 30 days' notice, a new trustee was to be appointed by Julian or, in the event of his failure to so appoint, by the election of the holders of a major portion of the interests in the production of oil from the premises. Julian was declared to be the exclusive agent for every assignee of interest in the production and was to have exclusive control over the premises and the trustee was not bound to recognize any rights or interests of assignees of production in or to the lease. Julian then sold to the public interests in the residue of the proceeds from the sale of oil from a well to be drilled on the premises. Certificates entitled "Participating Oil Agreement" were issued to the purchasers. These were of two classes. They were numbered serially *33 and purported to be made between Julian and the individual purchaser. They declared that in consideration of the purchase price paid to Julian to be used by him in drilling the well, he assigned a specified fractional part of 70 percent of the residue of the proceeds from the sale of the net production of the well. They further provided that Julian appointed the trustee as an attorney to demand and collect in behalf of the purchaser his portion of the net proceeds from production whenever it should be due and payable. If Julian defaulted in the performance of any condition of his lease, the purchaser was to be proportionately secured by a lien upon Julian's interest in the drilling site or products therefrom. The participating interests were transferable and some interests in each of the wells were actually transferred in each of the years 1938, 1939 and 1940. Each participant was a beneficiary of the trust and his liability was limited to his investment. Julian also sold "Special Participating Agreements" which differed from the above in that they related to a different fractional amount of the proceeds of production after payment of expenses but without payment of royalties. Julian *34 also sold fractional interests in the oil and gas produced from some of the wells subject to pro rata payment of operating expenses. Each of the petitioners represents a single well covered by a trust assignment and with respect to which separate participating agreements and fractional interests were created as above outlined. Except as to the number of units and percentages sold, the circumstances with respect to each of the petitioners are substantially the same. Julian drilled the wells and brought them into production in 1923 and operated them until 1925. The wells declined in production and on January 15, 1925, Julian, acting for himself and as agent for all holders of participating interests, made an agreement with W. J. Barnhart and D. R. Morrow under which the latter were to attempt to rehabilitate and then to continue to operate the wells for 50 percent (later 65 percent) of the remaining oil and gas, exclusive of landowners' royalties. A judgment creditor of Julian's levied execution on the wells and the purchaser at the execution sale conveyed whatever interest he may have acquired to W. A. Schwartz who thereupon claimed to be the owner of the wells except for the landowners' *35 royalty interests. Early in 1931 Julian brought suit in California to restrain Schwartz from taking possession of the wells. Schwartz filed a cross-complaint claiming that he was the owner and that the holders of the participating oil agreements and Barnhart-Morrow Consolidated (assignee of Barnhart and Morrow) had no interests in the wells. The holders of participating oil agreements in wells Nos. 1, 2, 3 and 11, through their agents or trustees, Redified, Foster and Penn, filed a crosscomplaint in this case of Julian v. Schwartz, asserting their ownership of the interests assigned them and made certain other claims. On January 7, 1932, the Court suspended Julian from any agency in connection with wells Nos. 1, 2, 3, 11 and 12, and appointed Redfield, Foster and Penn as trustees of rights and authority theretofore vested in Julian. Redfield resigned and Brenneman was appointed successor trustee on July 5, 1937, pending further order of the Court. Julian died in 1933. In this case of Julian v. Schwartz, two receivers, Cannon and Allison, were appointed in March 1931 to take charge of and operate the wells which were placed in their possession. Later Cannon was made sole *36 receiver and in March 1932 he was relieved as receiver by the Court to be replaced by Foster and Smith (later Olson in his stead) who were appointed trustees to operate the wells during the pendency of the action. The case was decided by the Superior Court on September 7, 1932, and, after appeal, was finally determined on October 28, 1936, with the decision that Schwartz had received no rights as a result of the original actions against Julian. The net result of the case was that Julian's various agreements were held valid. The bank was the owner in trust but without right of possession of the leasehold estates. The holders of the participating oil agreements were the equitable owners of the interests in the production and the proceeds of the production of the wells and were the beneficiaries of the trusts created with the bank. They were entitled to the exclusive possession of the wells through and by their managing agents, Redfield, Foster and Penn, and their successors in office, subject to the terms of the leases and the right of Barnhart-Morrow Consolidated to the actual possession and operation of the wells in accordance with its operating agreement. After the final determination *37 of the case and throughout the tax years in question Brenneman, Foster and Penn continued as trustees of the rights of Julian in behalf of the participating agreement holders. The organization for each well was known as a syndicate. The holders of the participating agreements held no meetings, and had no by-laws, seal or charter. The participating agreements do not provide that the agreement holders have any control over the property or voice in the management and operations of the wells and the sale of the oil and gas produced therefrom. Books and records were maintained by Julian, and later by the receiver and the court-appointed trustees, upon which were recorded the results of the operation of the wells. The Caminol Oil Company was the purchaser of the oil. The trustees could terminate the contract for the sale of oil if they could get a better price elsewhere. The purchase price was paid to the bank, which in trust paid the proper proportions to Barnhart-Morrow and held the balance for the benefit of the participating oil agreement holders. From the money thus received Brenneman, Foster and Penn paid taxes, attorneys' fees, clerical hire and trustees' fees. When there was sufficient *38 money in the bank, they decided whether any amount should be paid out to the interest holders. If they decided a distribution was to be made, a list of the names and addresses of the then holders of the participating interests was made up in the office of Brenneman and sent to the bank. The bank then sent Brenneman checks which were made up by him according to the holdings of the participating interests; he then returned them to the bank for signature, after which they were returned to Brenneman for mailing. Brenneman kept a record of all receipts and disbursements and also kept informed with respect to whether the oil produced was being sold at the best price obtainable. Fiduciary income tax returns on form 1041 were filed by Foster, Penn and Brenneman on behalf of Julian Well No. 1 Syndicate, Julian Well No. 2 Syndicate, and Julian Well No. 3 Syndicate, for each of the years 1938, 1939 and 1940, and on behalf of Julian Well No. 11 Syndicate for the years 1939 and 1940. Capital stock tax returns were filed "under protest" by the petitioners herein for the "regular" and "special" participating oil agreements, each separately for the fiscal years ended June 30 for the years 1938, *39 1939 and 1940. Any of the stipulated facts which have not been embodied in the foregoing findings of fact are incorporated herein by reference. Opinion The question presented is whether petitioners were, during the years 1938, 1939 and 1940, associations and therefore subject to taxation as corporations. [1]
The tests to be applied in determining whether a trust for carrying on a business is an association were set forth by the Supreme Court in Morrissey v. Commissioner, 296 U.S. 344. They include (1) continuity of existence during the term of the trust unaffected by death of participants, (2) centralized management, (3) transferability of beneficial interests, (4) liability of participants limited to the property embarked in the enterprise. Provision was made for the appointment of successor trustees. The participating oil agreements (or interests) were freely transferable. The lease *40 was held in trust for the participants by the bank. Each participant was a beneficiary of that trust and his liability was limited to his investment. The fact that the arrangement gave the trustee no control over the business but placed that function in Julian's hands is of no significance. It is no different than if Julian had made himself trustee with full power of management. Julian was in a fiduciary capacity himself. Where a trust is carrying on a business through trustees and is clearly an association, we can not believe that the mere splitting up of the powers of the trustees between two separate fiduciaries or groups of fiduciaries will remove it from the category of association. Where the bundle of rights are split so that one trustee holds title to the lease and another trustee holds the right to possession and control, the two must be considered together for our purposes. This is even more clear when we consider the situation as it actually existed during the tax years here in question, 1938, 1939 and 1940. Julian had been replaced by three fiduciaries by order of the state court. Thereafter he died in 1933. The three fiduciaries, with one change in their membership, continued *41 to represent the participants after the termination of the suit in 1936. Here we have a large group of persons associated together with undivided interests in the output of an oil well. Title to their oil lease is held for them by the trustee bank. Unlike partners they may freely transfer their interests, death of any one of them does not interfere with the continuity of the enterprise and their liability is limited to their investment. Foster, Penn and Brenneman call themselves and are known as managing agents and trustees. They are trustees of the personal property and oil proceeds. They filed fiduciary income tax returns for the years in question designating themselves as trustees. Originally appointed by the Court to take over Julian's functions, they continued in that capacity after the termination of the suit and through the three years in question. Under the management contract originally made with Julian and validated by the Court, Barnhart-Morrow Consolidated operated the wells, produced the oil and sold it during the years 1938, 1939 and 1940. The contract for the sale of oil to Caminol Oil Company, the purchaser of all the oil during these years, could be terminated at *42 any time by the managing trustees if they could get a better price from some other purchaser. They made inquiries but found that Barnhart-Morrow were getting a good price. These three trustees check the books of Barnhart-Morrow to ascertain whether the participating holders get their proper share. The fact that the actual operation of the wells is let out on contract to a concern of specialists does not prevent this from being an association. Should there be a breach of the contract or should it be terminated, the actual job of operating the wells would revert to the trustees. These trustees decide when a distribution is to be made to the participating interest holders. They were not leasing the property away to another and merely collecting rents, Cf. Cleveland Trust Co. v. Commissioner, 115 Fed. (2d) 481, but rather had hired a well operator who, if he failed to live up to his contract, could be removed. The real function of Barnhart-Morrow is to bring the oil up from the wells, a job requiring technical and mechanical skill but not the exercise of business judgment or discretion. It is the sort of job that would be delegated to a manager in any *43 event. Although Barnhart-Morrow Consolidated also sells the oil, the trustees may interfere with that selling contract at any time if they can get a better price. The only reason they have not done so is that after canvassing field they have discovered that Barnhart-Morrow was getting the best possible price. The fact that a trustee does not take active charge of a business is no bar to the trust being considered an association where the trustee has the power but does not exercise it. Adkins Properties v. Commissioner, 143 Fed. (2d) 380, affirming T.C. Memorandum Opinion. We think this case is governed by Helvering v. Combs, 296 U.S. 365, where a trust was created to finance and drill an oil well. The fact that operations were confined to a single well, that they did not hold a meeting, and that the trust had no office, place of business or bylaws, were held not determinative. The Court said, citing Morrissey v. Commissioner, supra:
* * * Here, thorugh the medium of a trust, the parties secured centralized management of their enterprise, and its continuity during the trust term without *44 termination or interruption by death or changes in the ownership of interests, and with limited liability and transferable beneficial interests evidenced by certificates. Entering into a joint undertaking they avoided the characteristic responsibilities of partners and secured advantages analogous to those which pertain to corporate organization. The fact that meetings were not held or that particular forms of corporate procedure were absent is not controlling. Like Thrash Lease Trust v. Commissioner, 99 Fed. (2d) 925, cert. denied 306 U.S. 654, this is a borderline case but it falls within the rule of Morrissey v. Commissioner, supra, as applied in that case. Some of the many percentage interests there assigned were in the oil and gas while others were in the lease. There were variations in the terms of the different assignments of interests. The Court there said: * * * There was no written agreement between Herbert R. Macmillan and Gordon Macmillan; neither was there any trust instrument defining the rights and interests of the percentage owners among themselves or in relation to the Macmillans, *45 who acted as managers by common consent. * * * There was no meeting of the beneficiaries and no appointments of agents or representatives, the Macmillans acting by common consent. * * * * *
The facts here would indicate that these percentage holders were engaged in an enterprise for the transaction of business and that the property was held and operated as a venture for profit as distinguished from the traditional type of trust, the only object of which is to hold and conserve particular property, with incidental powers, and not for the purpose of conducting a business and sharing its gains. * * * In this case, as in the Morrissey case, supra, the percentage holders were united for the purpose of carrying on a business enterprise for their own profit. Although there was no definite trust agreement or any writing expressing the purposes and limitations of the enterprise, it is apparent that the Macmillans were impliedly given extensive powers of management and control of the business which was definitely carried on for profit. The entity, whatever it may be called, was operating as a continuing business enterprise and intended to reap a profit from the production and *46 sale of oil and gas produced by the lessee on premises held under a lease in which all the percentage shareholders had an interest. This was not any ordinary trust. The title to the property, as far as the percentage shareholders were concerned, was in a single person denominated trustee. The respective interests of the several percentage holders were subject to transfer; the management, so far as appears, was centered in the Macmillans, who conducted the business much after the manner of directors of a corporation. As trustees of the rights formerly held by Julian, Brenneman, Foster and Penn had the right to possession and control of the wells. This case is unlike A. A. Lewis & Co. et al., v. Commissioner, 301 U.S. 385, where the Supreme Court pointed out: * * * The duties of the trustee were purely ministerial, with no power to control, direct, or participate in, the conduct of the selling enterprise contemplated by the contract. There is to be found in the operation of the business no essential characteristic of corporate control - nothing analogous to a board of directors or shareholders, no exemption from personal liability, no issue of transferable *47 certificates of interest. * * * We find no merit in petitioners' contention that, assuming the trusts to be taxable as associations, the "regular" and "special" participating agreements should be treated as different and distinct associations since their interests are in different fractions of the output. No such distinction was recognized in Thrash Lease Trust v. Commissioner, supra, where the difference in the interests was more marked than here. Notwithstanding the difference between the relationship of these two classes of participants and the relationship between classes of stock in a corporation, the argument of petitioners that they make up two different associations is artificial. Decision will be entered for respondent. Footnotes
1. Revenue Act of 1938. SEC. 901. DEFINITIONS. (a) When used in this Act - * * * * *
(2) The term "corporation" includes associations, joint-stock companies, and insurance companies. The provisions of section 3797 of the Internal Revenue Code↩ are the same.